*88 OPINION.
ARundell:
By amendment to its petition in Docket No. 8714 the petitioner claims that collection of any.taxes for the year 1917 is barred by the statute of limitations. By the terms of Commissioner’s Mimeograph 3085, promulgated April 11, 1923, the “ waiver ” of January 19, 1923, expired on April 1, 1924. Before the expiration date of the first “waiver” a second one was executed on January 2, 1924, and filed January 10 of the same year. A third was executed on January 12, 1924, and filed on January 17, 1924, which was identical with the January 2nd “waiver” except that the year 1918 was included. These latter “ waivers ” were not affected by Mimeograph 3085, Cunningham Sheep & Land Co., 7 B. T. A. 652, and the period for assessment and collection of taxes for 1917 had not expired when the further “ waiver ” was filed on December 22, 1924, extending for an additional jrear the period for assessment and collection.
The last “waiver,” dated November 17, 1925, for the year 1917 was filed prior to the date the last mentioned “ waiver ” would expire, and provided that assessment could be made up to December 31, 1926. No provision for collection was included in this “ waiver,” but this becomes unimportant in view of the provisions of section 278(d) of the Revenue Act of 1924. Sunshine Cloak & Suit Co., 10 B. T. A. 971. We are of the opinion that the statute has not expired either on the assessment or collection of taxes for the year 1917.
Several witnesses testified that they knew section 16 in general, or had been over it; that they were familiar with various sales of land in this oil field and that the petitioner’s land in section 16 was worth about $3,000 an acre on February 10, 1910, and in excess of that amount on March 1, 1913. Some of the witnesses predicated this value upon the favorable location of section 16 in relation to a theoretical “ gusher zone ” which was supposed to pass through the northeast quarter.
The sales which were cited as a basis for comparison were very briefly presented, without any details that might make direct comparison possible. The sale of 8 acres for $25,000 in section 25, township 32, range 23, by Barlow was too remote in point of time to have much weight in a valuation as of 1910. The same may be said of the sale by Laymance of 20 acres in section 19, township 30, range 22, in January, 1909, and in addition this property being some 18 miles away, was exceedingly remote for direct comparison.
The purchase by Laymance in section 36, township 12, range 34, at $500 an acre in April, 1909, and later safe of a part thereof at $3,000 an acre is of land over five miles distant from section 16. The date of the sale is not given, but the record shows that a gusher came in *89 on this section in November, 1909, known as the “Wellman”; also a gusher came in on the adjoining section 35 in August, 1909.
The sale in section 30, township 31, range 23, in June, 1910, for cash and bonds was just after a well producing 6,000 to 7,000 barrels a day came in on the property.
The sale in section 2, township 11, range 24, in September, 1910, was admitted to have been consummated largely on the showing of the Lake View gusher which was only about a mile distant.
The sale by Tryon in section 36, township 12, range 24, in November or December, of 1909, for $3,000 an acre was after a gusher came in on section 35, and probably after the Wellman gusher came in on section 36.
The sales in section 32, township 32, range 24, in the summer of 1910, were apparently after the Lake View gusher came in less than 2 miles away, and after the gusher came in on section 30, township 32, range 24, the property adjoining to the northwest.
From these sales it is apparent that values depend largely upon local or nearby development. No sale was cited at rates of $3,000 an acre or over in 1909 or 1910 unless the property was near or associated with a gusher. The great divergence of values from $200 an acre to $6,000 an acre indicates the great difficulty of direct comparison.
The land in section 16 was acquired in part by the predecessors of the petitioner and in part by the petitioner. Some of the prices were agreed upon in the middle of 1909, and therefore might be considered remote in point of time from February 10, 1910. However, there were certain transactions in 1910 that have some bearing on the value of this section. On February 4, 1910, Louis Titus purchased the N. ½ NE. ¾ SE. ½ of section 16, 20 acres, for $30,000, or $1,500 an acre. This was only 6 days prior to the date of acquisition by the petitioner and was apparently an arm’s-length transaction consummated on that date, since prior to that time Louis Titus had no options or leases or agreements on this land. On February 3, 1910, Titus acquired a lease on the E. ½ NE. ¾; the NW. ¾ NE. ¾; and the north 15 acres of the N. ½ SW. ½ NE. ½, no bonus being paid therefor, but providing for a one-fifth royalty. In so far as the east half of the northeast quarter is concerned, this transaction was at arm’s length and Titus had previously no option agreements or leases on this portion which were effective at the time this lease was made. The land covered by this lease was purchased by the petitioner in August, 1910, when $200,000 par value of bonds and $200,000 par face value of stock, together with $2,244.50 in cash was paid over to the Lockwood Company. The petitioner has introduced evidence which convinces us that on August 10, 1910, the bonds had a market value of 80 per cent of the face value, and the stock 20 per *90 cent of par. Assuming that all of the consideration was paid for the 135 acres under lease, the rate would be approximately $1,500 per acre. This land included practically all of the area in section 16, which had been designated by the experts as lying within the “gusher zone.” This sale was made after the Regal No. 1 gusher came in on section 14, a little over one mile to the east, and after the Lake View gusher came in on section 25, township 42, range 24, and the Standard gusher on section 30, township 32, range 24.
The south half of the southwest quarter was also purchased by the Hartford Oil Co. on or before February 10, 1910, and the petitioner does not contend that it was purchased before February 10. This land was acquired for $78,480, or approximately $980 an acre.
The transactions within section 16 that are evidence of value on February 10, 1910, are:
30 acres, N ⅛ of NE ¾. of SE ⅛, purchased at-$1,600 an acre.
136 “ NE ½, fee subject to lease, “ “_$1,500 an acre.
80 “ SW ½ “ “_ $980 an acre.
The purchase of the 135 acres in August, 1910, is considered a maximum value applicable to the 135 acres as of February 10, 1910, in view of the testimony as to general increase in values in this district.
These transactions within section 16 itself covering over half the area, are certainly of material value in ascertaining the actual cash value of the entire holdings of the petitioner in section 16, and the weight that should be given to the theory of the “ gusher zone ” passing over the northeast quarter.
There is evidence in the record which would raise some doubt as to the possibility of finding a “ gusher ” in the northeast quarter of section 16. The exhibits introduced in evidence disclose the depth at which various gushers penetrated the oil sands and we have set forth in our findings of fact this information as it applies to certain wells.
The gushers located to the east and southeast of section 16 penetrated the oil sands at from 1,100 to 1,500 feet below sea level. The exhibits show that the deepest sands that could be drilled in section 16 were only about 700 below sea level.
The “ gushers ” to the northwest encountered the sands at points where the oil sands were indicated at sea level or above sea level. It is also shown by the exhibits submitted that the “ gushers ” to the northwest are not located on the Spellacy Anticline, and therefore the conditions in that section are not indicative of what might be expected on the Spellacy Anticline.
The development surrounding section 16 at February 10, and March 1, 1913, did not reduce this doubt but rather increased it since no “ gushers ” were found within a mile of section 16, although *91 numerous wells were drilled to the northwest and southeast and many wells were drilled to the east and north. The record shows that wells were drilled in section 9, one-half mile to the north; in section 15, very near the eastern line of section 16; in section 14, southwest corner. None of these wells, although located in the so-called “ gusher-zone ” are reported as being “ gushers ” or even commercial wells.
By March 1, 1913, some 100 wells had been drilled in the “ gusher zone ” from section 6, township 32, range 23, to section 30, township 32, range 24, and only one real “ gusher,” the Regal No. 1, was developed. This well penetrated the sands at a point where the sands are indicated at a depth of 1,300 feet below sea level.
It was subsequent to the date when this well came in that the petitioner was able to purchase the fee to 135 acres in the northeast quarter of section 16 at a price of some $1,500 an acre, indicating that the previous owners of the property placed little reliance on the possibility of a “ gusher zone ” being found in that area.
The wells put down by the petitioner in the northeast quarter in 1911 also tended to disprove the “ gusher zone ” theory. Well No. 71 was drilled in the extreme northeast corner and produced about 50 barrels a day. Well No. 67 was in the northwest corner and produced 100 barrels a day. Both of these wells were in the theoretical “gusher zone.”
After a review of all the testimony we are of the opinion that the cost of section 16 to the petitioner was as follows:
Leasehold on 135 acres in northeast one-fourth, acquired by the predecessor 7 days prior to February 10, 1910__No bonus value
South one-half of southwest one-fourth, acquired on or before February 10, 1910, by predecessor for $78,480_$78, 480. 00
Balance of area comprising about 265 acres, valued at $1,500
an acre- 397,500.00
475,980. 00
Subsequently paid to perfect title_ 42, 000. 00
Fee title to 135 acres acquired in August, 1910, for bonds and stock,
and cash- 202,244.50
Total cost- 720,224.50
Between February, 1910, and March 1, 1913, about 26 wells were drilled in the south one-half of section 16. One well, No. 34, produced from 300 to 400 barrels a day and was considered very valuable. The cpst of this development was $51,727.64 in 1910 and $235,959.39 in 1911, a total of $287,687.03. The production from section 16 prior to March 1, 1913, was 90,414 barrels in 1910, 425,000 barrels in 1911, 580,775 barrels in 1912, and 84,513 barrels for two months in 1913, or a rate of 507,000 barrels a year.
*92 The estimate of oil content at March 1, 1913, made by the petitioner’s geologist was 4,300,000 barrels. The market price of oil at March 1,1913, was not over 35 cents a barrel. In order to realize this production it would appear that some 60 or 70 additional wells would have to be driven. The average cost of wells in the south half of section 16 was $8,000 to $9,000 a well, and since wells in the north half of the southeast quarter and in the northeast quarter would have to be deeper, the average cost would be greater. Then, in order to develop this property, $700,000 to $800,000 would have to be spent in drilling wells.
With all of these conditions in view and after considering the opinions of the various witnesses, we are uf the opinion that the fair market value of the petitioner’s oil land in section 16 was $700,000 exclusive of the value of development already completed. Accordingly the depletion rate would be based on this value and 4,300,000 barrels of oil.
The petitioner is also entitled to a deduction based on the development expended in 1910 and 1911. These expenditures were capital expenditures subject to exhaustion based on the reserve in February, 1910, of 5,476,805 barrels.
During 1917 the petitioner paid to the Oil Industry Association $8,000. No evidence was presented on this issue and consequently the action of the respondent is approved.
During 1917 and 1918 it appears that certain damage was done to oil derricks by fire and certain sums were expended in restoring the derricks. The destruction of a derrick, or a part of a derrick, by fire resulted in a loss, and a loss of this character represents an allowable deduction under section 214(a) (4) of the Revenue Act of 1918. The amounts spent in restoring the property destroyed are capital expenditures. Accordingly, the action of the Commissioner in respect to this issue is approved. Nor do we find error in the action of the respondent in reducing invested capital for 1918 and 1919 in amounts equal to the amounts allowed as deductions for fire losses.
No testimony was introduced relative to the expenditures for gasoline engines in 1918 and 1919. Expenditures of this nature are normally capital expenditures. The action of the Commissioner in disallowing the deductions is approved.
During the years here involved the petitioner was in complete possession of section 2, except that from February 2, 1916, to June 5, 1917, it was operating under the supervision and control of a receiver. It accrued in each year on its books the income applicable to the oil produced and sold. During 1917, however, it did receive the amounts which had been held by the receiver representing income from February 2,1916, to June 5,1917.
*93 The respondent affirmatively alleges that the amount impounded in the hands of the receiver in 1916 and released to petitioner in 1917 was income to the petitioner in the latter year. The respondent’s principal argument in support of his claim herein is that petitioner was on the cash receipts and disbursements basis in the years 1916 to 1919, inclusive, and, as the amount here involved was not actually received by the petitioner until 1917 it must be taxable income in that year. We think it immaterial whether petitioner’s accounts were kept on the receipts and disbursements basis or some other basis as permitted by section 13(d) of the Revenue Act of 1916. The fact is that the income was actually produced in 1916. The sole reason that it did not reach the petitioner in that year was because of the suit by the United States. By reason of that suit a receiver was appointed, who actually received the income, and who should have reported it for taxation. Section 13(c) of the Revenue Act of 1916; United States v. Chicago & E. I. Ry. Co., 298 Fed. 779; Forstmann v. Ferguson, 17 Fed. (2d) 659, affirmed, 25 Fed. (2d) 659. If the receiver did not report it, that is no sufficient reason for taxing the petitioner on it in a later year. Accordingly, the amount of $171,979.22 received by petitioner in 1917 is not an item of income in that year. This amount is the amount stipulated as being the net income impounded in the hands of the receiver during the period February 2, 1916, to December 31, 1916. The amount which the respondent alleges should be included in 1917 income is $253,150.96. What the difference consists of we do not know. The burden being on the respondent to establish his affirmative allegation in regard to this amount, and he having failed to do so, we must hold that no part of it may be included in income for 1917.
The parties have stipulated that the amounts paid to Wheeler and Bowie in 1917, 1918, and 1919 represented 4 per cent of gross production specified in the contract, also that $35,795.54 deducted in 1917 represented accruals for 1916 and 1917. Since the 4 per cent in 1917 amounted to $20,441.18, the accrual for 1916 must have been the difference, or $15,354.36.
The agreement with Wheeler and Bowie provided that the petitioner would pay to them 4 per cent of all the oil, gas, or other mineral produced from section 2 in the event of the successful termination of certain court and land office proceedings and not otherwise; that “ successful termination of said court and land office proceedings * * * means the issuance of patents by the United States government, either covering the whole of Section 2 in favor of the applicants therefore * * * or the issuance of such patents covering any portion of said section, in which latter event said rights of the Attorneys shall attach to any and each portion *94 patented ”; that “ the attorneys shall not be entitled to any of said products or the proceeds thereof except in the event of the successful termination of said proceedings * * * but in the event of such successful termination, the Company shall account to the Attorneys for the proceeds of the sale of 4 per cent of such mineral products from the first day of January, 1916, to the date of such successful termination after which date the rights of the Attorneys shall attach ”; that “ the rights of the Attorneys to such four (4%) per cent upon attaching shall thereafter run with the land and bind the said Company and its successors and assigns.”
The petitioner contends that the agreement with the attorneys conveyed to them an interest in the real estate, and consequently the proceeds derived from the sale of 4 per cent of the oil were not income to the petitioner since by the agreement the petitioner owned only a 96 per cent interest in the oil property.
In support of this contention the petitioner cites the case of Graciosa Oil Co. v. Santa Barbara, 155 Cal. 140; 99 Pac. 483, which involved taxes assessed against the lessee of oil property. In that case the court said:
But the contract in question vests no present title in a stratum in place. It leaves tlie title to tlie oil in tlie landowners until it is brought to the surface. The right vested in the plaintiff is an estate for years, so far as necessary for the purpose of taking oil therefrom, and it carries with it the right to extract the oil and remove it from the premises. This right constitutes, for the term prescribed, a servitude on the land and a chattel real at common law.
We fail to see that the rights of the attorneys in this case are at all similar to the rights of the lessee in the Graciosa case. The attorneys had the right to receive 4 per cent of the oil produced. They had no right to extract oil or to enter upon the land for that purpose, a point on which the decision in the Graciosa case was largely based. If oil was not produced from section 2, the attorneys would have no claims which they could enforce. By no exercise of the imagination can we read into the agreement any assignment of a portion of the fee title to land, nor any title to an undivided interest in the oil stratum. The attorneys’ rights begin only after oil has been produced, and then only to the extent of receiving 4 per cent of the oil produced or the proceeds of a sale thereof. We are, therefore, of the opinion that the attorneys did not acquire an interest in the real estate^ and that all of the income derived from the sale of oil from section 2 was income of the petitioner.
We have held that the expenses of defending title are capital expenditures. Consolidated Mutual Oil Go., 2 B. T. A. 1067; West End Consolidated Mining Co., 3 B. T. A. 128; Bugher, et al., Executors, 9 B. T. A. 1155. Therefore, the amounts paid the attorneys in *95 1917, 1918, and 1919 are not deductible as expense, but are capital expenditures.
The amounts paid the attorneys being capital expenditures, it follows that depletion is allowable in respect of such amounts. The question then arises as to how such allowances shall be computed. Ordinarily, depletion is allowable in respect of capital costs by spreading the cost over the remaining life of the oil reserves. But that method is inapplicable here for the reason that as the oil reserves were depleted the capital cost would be annually increased, which would necessitate an annual increase in the depletion rate and result in unreasonable depletion deductions. Such a method might do very well and might be the only one that could be used where the capital cost was applicable only to future production, but here the amount paid in any year is a part of the cost of both past and current production as well as that in the future. The solution that seems to us will produce a proper result is to allow as depletion in each year an amount equal to the 4 per cent paid to the attorneys. By this method, when eventually production ceases, the petitioner will have returned to it through the depletion allowances exactly the amount of its capital expenditure and the depletion deduction each year will be reasonable.
In computing invested capital for the years in question surplus should be reduced by the depletion sustained due to the extraction of oil from the property. Such depletion should be based upon the cost of the oil properties and subsequent capital additions, the oil reserves applicable thereto and the oil extracted to the year in question. This is in accord with the several cases involving depletion sustained, previously passed upon by the Board, and is in accordance with the decision in W. S. Bogle & Co., Inc., 5 B. T. A. 541, and Entress Brick Co., 9 B. T. A. 588. The depletion sustained should be recomputed in the light of the finding in this case.
In accordance with the stipulation respecting the capital expenditures of $51,727.64 in 1910 and $235,959.39 in 1911, these amounts should be taken into capital accounts for the years in which expended, and the undepleted balances added to capital sum remaining in 1916 for the purpose of computing invested capital and depletion allowances for 1917, 1918, and 1919.
The reduction of invested capital for the years 1917, 1918,. and 1919 on account of depletion sustained in prior years was alleged in the petitions as an error on the part of the respondent. This was not urged at the hearing, being only briefly mentioned by counsel for petitioner in his opening statement, and is not mentioned at all in petitioner’s brief. We affirm the respondent’s computation in principle, but adjustments will necessarily be made in the amounts *96 upon the basis of value of petitioner’s lands for depletion purposes as found by this decision.
The respondent’s reduction of invested capital on account of prior years’ taxes is likewise affirmed in principle, section 1207, Revenue Act of 1926; Russel Wheel & Foundry Co., 3 B. T. A. 1168, but the amounts by which invested capital is reduced will need revision to conform to changes in taxes wrought by this decision. This is a matter to be settled under Rule 50.

Judgment will he entered wider Rule 50.